UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARTA BRYCELAND, Derivatively on Behalf of Abiomed, Inc., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL R. MINOGUE, W. GERALD AUSTEN, LOUIS E. LATAIF, DOROTHY E. PUHY, MARTIN P. SUTTER, HENRI A. TERMEER and PAUL G. THOMAS, <br><br> Defendants, <br><br> -and- <br><br> ABIOMED, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Plaintiff, by and through her attorneys, brings this action derivatively on behalf of nominal defendant Abiomed, Inc.  ("Abiomed" or the "Company") and alleges upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2.     This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and/or certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least August 5, 2011 through October 31, 2012 ("Relevant Period").

3.     Abiomed, with its headquarters in Danvers, Massachusetts, develops technologies designed to assist or replace the life-sustaining pumping function of the failing heart.

4.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was improperly marketing and/or labeling its Impella 2.5 system; (2) that the Company's financial results would be materially impacted if the Company were either forced to stop its improper conduct or unable to continue its improper conduct; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this district, or is an individual who has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this district; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this district, and (3) defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this district.

## PARTIES

8.      Plaintiff Marta Bryceland is a current shareholder of the Company and has been a shareholder of the Company during the Relevant Period.

9.      Nominal Defendant Abiomed, Inc. ("Abiomed") is a Delaware corporation with its principal executive offices located at 22 Cherry Hill Drive, Danvers, Massachusetts 01923.

10.     Defendant Michael R. Minogue ("Minogue") is, and at all relevant times was, Chairman, President and Chief Executive Officer ("CEO") of Abiomed.   Plaintiff is informed

and believes, and thereupon alleges, that Minogue is a citizen of the Commonwealth of Massachusetts.

11.     Defendant W. Gerald Austen ("Austen"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Austen is a citizen of the Commonwealth of Massachusetts.

12.     Defendant Louis E. Lataif ("Lataif"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Lataif is a citizen of the Commonwealth of Massachusetts.

13.     Defendant Dorothy E. Puhy ("Puhy"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Puhy is a citizen of the Commonwealth of Massachusetts.

14.     Defendant Martin P. Sutter ("Sutter"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Sutter is a citizen of the State of Texas.

15.     Defendant Henri A. Termeer ("Termeer"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Termeer is a citizen of the Commonwealth of Massachusetts.

16.     Defendant Paul G. Thomas ("Thomas"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Thomas is a citizen of the State of New Jersey.

17.     The Defendants identified in ¶¶10-16, above, are sometimes collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

19.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

20.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

21.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

22.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

   a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

   b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

   c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

   e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

23.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

24.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.  In addition, the Company is now the

subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

25.     Additionally, the Company has established a Code of Conduct and Ethics ("Business Code") that applies to all employees of the Company.  The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Business Code.   The Business Code provides, among other things, the following:

> This Code of Conduct is designed to provide employees with information on expectations for behavior and to describe some important legal issues. It is not, however, a rulebook or an interpretation of the law. It may not provide a clear-cut answer to every situation. Above all, it is not a comprehensive list of "dos" and "don'ts". In general, my expectations are that no individual will engage in any illegal or unethical behavior, nor tolerate those that do. If you have any questions or concerns about the Code or any conduct, please discuss those concerns with a member of the management team, the corporate compliance officer, or use the hotline described in the Code.

> ABIOMED's reputation as a leader in medical device technology and related scientific fields is based, to a large extent, on the excellence of its technology and products and on the skill, integrity and superior performance of its personnel. We shall endeavor to provide our customers with quality products, and, when we are involved in research and development work, we will use our best efforts to achieve the results for which we have been engaged. We shall ensure that our promotional material, proposals, quotations, reports, specifications, scientific and medical publications, application guides, news releases, and other descriptive literature accurately depict our products or developments and are free from exaggeration and misleading information.

> It is the Company's policy to strictly comply with all federal, state and local laws and regulations pertaining to all products that we develop and manufacture. We recognize that we are in the business of making medical devices and therefore human life may depend on the reliability and performance of our products. We shall adhere to the highest standards of excellence in every aspect of development and manufacturing of our products. We owe this to our patients, to our customers, to our shareholders and to ourselves. We shall conduct our work in accordance with this policy and will immediately report to the corresponding Officer any practices that we may observe that are not in full compliance with it.

**Conflicts of Interest**

The guiding principle of our policy on this matter is that all employees must avoid situations in which their personal interests may conflict, or appear to conflict, with the interests of ABIOMED.

At the same time, ABIOMED does not wish to infringe on the personal lives or affairs of employees. For example, we respect the rights of our employees to manage their own financial affairs and investments. However, an employee assumes certain obligations when joining ABIOMED or accepting a position of responsibility in the organization, and ABIOMED naturally expects all employees to respect its interests.

All of us can recognize clear-cut cases of dishonesty. Conflicts of interest may be more difficult to detect, and sometimes it is only a matter of degree between an acceptable and an unacceptable activity. The responsibility for conduct within the letter and the spirit of this policy must rest with each individual. However, we want to stress that it is important to avoid not only any situation that is an obvious conflict of interest but also a situation that might give the appearance of being one.

*** 

Employees shall have the continuing affirmative duty to report to the Chief Executive Officer of ABIOMED any personal ownership interest or other relationship that might affect their ability to exercise impartial, ethical business judgments in the area of their responsibilities. Each situation reported shall be reviewed by ABIOMED and a determination shall be made as to whether a conflict of interest exists or may arise from such a situation. All employees shall give ABIOMED their fullest cooperation in the correction of any situation in which a conflict of interest exists or may arise.

**Disclosure of Material Information**

The primary objective of the federal securities laws is to ensure that the public has accurate and complete information on which to base investment decisions. These laws are designed to encourage a flow of information to the public.

ABIOMED's obligations under such laws will be generally met through the means of prospectuses, annual reports to shareholders, proxy statements, and periodic reports filed with the Securities and Exchange Commission. In addition, ABIOMED has an obligation to announce to the public, at the proper time, "material" developments concerning its operations. Such an announcement is made through a press release, as this will ensure that accurate information is made available to all members of the investing community on an equal basis.

It is not possible to define "material" information to cover every set of circumstances that might arise. We must, therefore, describe it in broad terms. It has been held that information is "material" if there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy, sell, or hold stock. Material information has also been described as information of sharp and immediate significance. If known, such information could be expected to affect substantially the market price of the stock.

Examples of what would generally be considered as being "material" in this context include: significant regulatory milestones, significant new products or discoveries, major contract awards or major contract cancellations, acquisitions, stock splits, major management changes, significant litigation or regulatory proceedings, information about sales of our products, financial projections and financial results.

It is unlawful for employees who have "material" undisclosed information to take personal advantage of that information by trading in ABIOMED's stock so long as the information remains undisclosed. This means that an employee in possession of "material" undisclosed information must refrain from trading ABIOMED stock until ABIOMED determines that the information should be released and makes the proper public disclosure, and the investing public has had a reasonable opportunity to evaluate the information. A delay of at least two full days should suffice for a simple announcement. A longer delay may be appropriate when a complex transaction is involved.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

26.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

27.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

(a)     Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

(b)     Maintain the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and

(c)     Deceive the investing public, including shareholders of the Company, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financial condition that had been misrepresented by the Individual Defendants throughout the Relevant Period.

28.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

29.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period.   During this time, the Individual Defendants caused the Company to conceal material facts, misrepresent its financial results, and violate applicable laws.   In addition, the Individual Defendants also made other specific, false statements about the Company's financial performance and future business prospects, as alleged herein.

30.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (1) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock, or to sustain a price that was artificially inflated, so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

31.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

32.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein.   In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

## **SUBSTANTIVE ALLEGATIONS**

33.     During the Class Period, the Company issued materially false and misleading statements and failed to disclose material and necessary information regarding the marketing and labeling of its Impella 2.5 systems, which had a direct impact on Abiomed's revenue, as well as the manner in which the Company reported this information in its financial statements.

34.     These material misstatements and omissions began on August 5, 2011, when the Company filed its Quarterly Report on Form 10-Q with the SEC, stating in relevant part:

> ...In June 2011, we received a warning letter from the FDA stating that some of our promotional materials marketed the Impella 2.5 for uses that had not been approved by the FDA.  ***We have cooperated with the FDA in addressing its concerns and believe that we have resolved the matter without any penalties. Although we believe that this issue has been resolved***, if similar matters come up in the future, we may not be able to resolve them without facing significant consequences. Such matters could result in reduced demand for our products and would have a material adverse effect on our operations and prospects.

(Emphasis added).

35.     Despite the negative impact that an adverse FDA finding would likely have the Company's revenue, Defendants continued to report overly positive statements with respect to the Company's financials, yet omitted making material and necessary disclosures concerning the marketing and labeling concerns of the Impella 2.5 systems.   For example, on November 3, 2011, the Company issued a press release entitled, "Abiomed Reports Record Revenue of $29.5 Million and Profitability for Second Quarter of Fiscal 2012, Driven by 40% Impella Growth." Therein, the Company, in relevant part, stated:

**Financial and operating highlights during the second quarter of fiscal 2012 include:**

- Fiscal second quarter worldwide Impella(R) revenue totaled $24.8 million, up 40% compared to revenue of $17.7 million during the same period of the prior year. U.S. Impella revenues of $23.1 million were up 41% from the prior year.

- Total U.S. revenues of $27.3 million were up 25% from $21.8 million in the prior year. Revenue from outside the U.S. totaled $2.2 million, up 38% from $1.6 million in the prior year.

- In alignment with the Company's strategy to open fewer sites and drive deeper utilization at existing customer sites, an additional 22 U.S. hospitals purchased Impella 2.5 during the quarter, as compared to 27 hospitals added in the second quarter of fiscal 2011, bringing the total to 568 customer sites.

- Revenue from the sales of BVS(R) 5000, AB5000(TM), related accessories and funded research and development was $2.8 million for the second quarter of fiscal 2012, 35% lower than $4.3 million in the second quarter of fiscal 2011.

- Service revenue totaled $1.9 million in the second quarter of fiscal 2012, up 36% from $1.4 million in the prior year.

- Gross margin rate for the second quarter of fiscal 2012 was 81%, an increase of 4 points compared to 77% in the second quarter of fiscal 2011.

- GAAP net income for the second quarter of fiscal 2012 was $0.6 million, or $0.02 per basic and diluted share, a $3.8 million improvement

compared to a GAAP net loss of $3.2 million or a loss of $0.09 per basic and diluted share for the second quarter of fiscal 2011.

- Non-GAAP net income, which is described later in this press release, for the second quarter of fiscal 2012, was $3.4 million, or $0.09 per basic and diluted share, a $4.3 million improvement compared to a non-GAAP net loss of $0.9 million or a loss of $0.02 per basic and diluted share, in the second quarter of fiscal 2011.

- Cash, cash equivalents and short-term marketable securities totaled $60.8 million at September 30, 2011, an increase of $1.7 million from $59.1 million at June 30, 2011.

- On September 19, 2011, Abiomed announced the first patient enrolled in MINI-AMI, an FDA prospective, randomized, controlled multi-center study to assess the role of 24 hours of direct unloading of the left ventricle with Impella 2.5 support to reduce infarct size in patients with ST-elevation myocardial infarction (STEMI) without cardiogenic shock.

- At the Transcatheter Cardiovascular Therapeutics (TCT) 2011 meeting, the Company will be announcing new clinical and economic data from PROTECT II during three breakfast sessions. In addition, there will be more than 20 presentations involving Impella at the annual conference, to be held in San Francisco from November 7 to 11, 2011.

- The Company will also be presenting new information at the American Heart Association (AHA) Scientific Sessions in Orlando, to be held from November 12 to 16, 2011.

- The Company will be holding an investor day on Friday, December 9, 2011 at the New York Palace hotel. The meeting will review recent data and product announcements and also disclose new product enhancements and other company updates.

Based on the 25% revenue growth in the first half of fiscal 2012 and current expectations, the Company is reiterating full fiscal year 2012 revenue guidance to increase by 20% to 24% and be in the range of $120 million to $125 million.

36.     Again, on February 3, 2012, the Company issued a press release entitled,

"Abiomed Reports Record Revenue of $32.2 Million and Earnings of $2.9 Million for Third

Quarter of Fiscal 2012."  Therein, the Company, in relevant part, stated:

**Financial and operating highlights during the third quarter of fiscal 2012 include:**

- Fiscal third quarter worldwide Impella® revenue totaled $27.7 million, up 31% compared to revenue of $21.2 million during the same period of the prior year. U.S. Impella revenue of $25.5 million was up 30% from the prior year.

- Total U.S. revenue of $29.6 million was up 17% from $25.3 million in the prior year. Revenue from outside the U.S. totaled $2.6 million, up 37% from $1.9 million in the prior year.

- An additional 37 U.S. hospitals purchased Impella 2.5 during the quarter. There are now 605 Impella U.S. customer sites.

- Gross margin rate for the third quarter of fiscal 2012 was 80.5%, compared to 80.0% in the third quarter of fiscal 2011.

- Non-GAAP net income, which is described later in this press release, was $4.6 million, or $0.11 per diluted share compared to non-GAAP net income of $1.4 million or $0.04 per diluted share, in the third quarter of fiscal 2011.

- Cash, cash equivalents and short-term marketable securities totaled $69.6 million at December 31, 2011, an increase of $8.8 million from $60.8 million at September 30, 2011.

- The ACCF/AHA/SCAI 2011 Guidelines for Percutaneous Coronary Intervention (PCI), released on November 7, 2011, incorporated Impella support for both the emergent and prophylactic settings.

- At the Transcatheter Cardiovascular Therapeutics (TCT) 2011 meeting, the Company announced new economic data, demonstrating that Impella significantly reduced major adverse events at an incremental cost per quality-adjusted life year considered to be cost-effective for advanced cardiovascular technologies.

- Additional PROTECT II clinical analyses were presented at TCT 2011, which demonstrated that patients undergoing extensive revascularization showed the most clinical benefit in the Impella arm to 90 days.

- At the American Heart Association (AHA) Scientific Sessions in November 2011, the Company also announced Symphony™, a new synchronized, implantable heart pump designed to treat New York Heart Association (NYHA) Class III heart failure patients.

- At its annual investor day, the Company announced several product updates, including the introduction of a new higher flow Impella device

named Impella cVAD™, estimated timing for Impella market entry into Japan in 2013, and the first-in-man implant of Symphony. The Symphony and cVAD products are not yet approved by the Food and Drug Administration for use in the United States.

37.     On May 16, 2012, the Company issued a press release entitled, "Abiomed Announces Record Fourth Quarter Revenue of $37.3 Million, Up 31% and Achieves Profitability for Full Fiscal Year."  Therein, the Company, in relevant part, stated:

**Financial and operating highlights during the fourth quarter of fiscal 2012 include:**

- Fiscal fourth quarter worldwide Impella revenue totaled $32.3 million, up 43% compared to revenue of $22.6 million during the same period of the prior year. U.S. Impella revenue grew 44% to $29.9 million.

- Full year worldwide Impella revenue totaled $106.9 million, up 37% compared to revenue of $78.2 million during the same period of the prior year. U.S. Impella revenue grew 37% to $99.1 million.

- As targeted, an additional 26 hospitals purchased Impella 2.5 during the quarter, bringing the total to 631 customer sites.

- Gross margin rate for the fourth quarter FY 2012 was 81.8% compared to 79.5% in the prior year. For the full fiscal year, gross margin rate was 80.6% compared to 78.3% in the prior year.

- Non-GAAP net income for the fourth fiscal quarter, which is described later in this press release, was $5.3 million or $0.13 per diluted share compared to $0.6 million or $0.01 per diluted share in the prior year. For the full fiscal year, non-GAAP net income was $12.1 million or $0.30 per diluted share compared to a non-GAAP net loss of $2.1 or a loss of $0.06 per share in the prior year.

- Cash, cash equivalents and short-term marketable securities totaled $77.2 million as of March 31, 2012, an increase of $7.6 million from December 31, 2011; the company continues to have no debt.

- Abiomed announced in April the successful first human use outside the U.S. of the Impella cVADTM device, a new percutaneous Impella heart pump that provides peak flow of approximately four liters of blood per minute.[]

- Abiomed also announced in April that it received CE Marking approval in the European Union to market the Impella cVAD device.[]

- At the American College of Cardiology Scientific Sessions in March, there were multiple presentations on the Impella platform, including first-in-man experience outside the U.S. with the Impella RP, a new percutaneous heart pump designed to treat right-sided heart failure.[]
- The fourth quarter fiscal 2012 represented the first full quarter after the November 2011 release of the ACCF/AHA/SCAI 2011 Guidelines for Percutaneous Coronary Intervention (PCI), which incorporated Impella support for both the emergent and prophylactic settings.

38.     The Annual Report filed on Form 10-K with the SEC on June 4, 2012, in relevant part, stated:

The FDA and other regulatory agencies actively enforce regulations prohibiting promotion of off-label uses and the promotion of products for which marketing clearance has not been obtained. If the FDA or another regulatory agency determines that our promotional materials or training constitutes promotion of an unapproved use, it could request that we modify our training or promotional materials or subject us to regulatory enforcement actions, including the issuance of a warning letter, injunction, seizure, civil fine and criminal penalties. Although our policy is to refrain from statements that could be considered off-label promotion of our products, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion. In June 2011 we received a warning letter from the FDA stating that some of our promotional materials marketed the Impella 2.5 for uses that had not been approved by the FDA. *We cooperated with the FDA and made changes to our promotional materials in response to the warning letter. However, in April 2012, we received a follow up letter from the FDA stating that some of our promotional materials continued to market the Impella 2.5 in ways that are not compliant with FDA regulations.* We are cooperating with the FDA in addressing its concerns. While we hope to be able to resolve this matter without incurring penalties, we may not be able to resolve it, or any similar matters that may come up in the future without facing significant consequences. Such matters could result in reduced demand for our products and would have a material adverse effect on our operations and prospects.

(Emphasis added).

39.     Despite indications from the FDA that Abiomed's marketing and labeling practices were still not compliant with FDA regulations, the Company continued to issue false and misleading statements and made material omission regarding this matter.

40.     On August 2, 2012, the Company issued a press release entitled, "Abiomed Announces Record Revenue of $38.8 Million, Up 42% and Worldwide Impella Revenue Growth of 56%."  Therein, the Company, in relevant part, stated:

**Financial and operating highlights during the first quarter of fiscal 2013 include:**

- Fiscal first quarter worldwide Impella® revenue totaled $34.7 million, up 56% compared to revenue of $22.2 million during the same period of the prior year. U.S. Impella revenue grew 61% to $33.0 million from $20.5 million in the prior year.

- An additional 34 hospitals purchased Impella 2.5 during the quarter, bringing the total to 665 customer sites.

- Gross margin rate for the first quarter of fiscal 2013 was 80.8% compared to 78.5% in the first quarter of fiscal 2012.

- Non-GAAP net income for the first quarter of fiscal 2013, which is described later in this press release, was $6.5 million or $0.16 per diluted share compared to non-GAAP loss of $1.2 million or a loss of $0.03 per share in the first quarter of fiscal 2012.

- Cash, cash equivalents and short-term marketable securities totaled $81.2 million as of June 30, 2012, an increase of $4.0 million from March 31, 2012.

- Abiomed announced in April the successful first human use outside the U.S. of the Impella cVADTM device, a new percutaneous Impella heart pump that provides peak flow of approximately four liters of blood per minute.[]

- Abiomed also announced that it received CE Marking approval in April from the European Union, as well as Health Canada approval in June, to market the Impella cVAD device.1

- Abiomed participated in several key industry meetings and regional tradeshows during the first quarter of fiscal 2013, including the Society for Cardiovascular Angiography and Interventions (SCAI) 2012 Scientific Sessions, EuroPCR, Heart Rhythm 2012 Scientific Program, and the Annual C3 Conference.

41.     The statements contained in  ¶¶34-40, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was improperly marketing and/or labeling its Impella 2.5 system; (2) that the Company's financial results would be materially impacted if the Company were either forced to stop its improper conduct or unable to continue its improper conduct; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.  Defendants breached their fiduciary duties to the Company and to Abiomed's shareholders in allowing the material misstatements to be issued and by failing to disclose material information concerning the Company's marketing and labeling practice, and more importantly, the FDA's conclusions regarding the Company's marketing and labeling practices.

42.     On November 1, 2012, prior to the opening of the markets, the Company issued a press release entitled, "Abiomed Announces Revenue of $37.4 Million, Up 27% and Worldwide Impella(R) Revenue Growth of 32%."  Therein, the Company, in relevant part, stated:

**Recent financial and operating highlights include the following:**

- Fiscal second quarter worldwide Impella revenue totaled $32.8 million, up 32% compared to revenue of $24.8 million during the same period of the prior year. U.S. Impella revenue grew 33% to $30.8 million from $23.1 million in the prior year.

- As targeted, an additional 30 hospitals purchased Impella 2.5 during the quarter, bringing the total to 695 U.S. Impella customer sites.

- Gross margin rate for the second quarter of fiscal 2013 was 80.8% compared to 81.2% in the second quarter of fiscal 2012.

- Non-GAAP net income for the second quarter of fiscal 2013, which is described later in this press release, was $8.4 million or $0.20 per diluted share, compared to $3.4 million or $0.09 per diluted share in the second quarter of fiscal 2012.

- Cash, cash equivalents and short-term marketable securities totaled $89.0 million as of September 30, 2012, an increase of $7.8 million from June 30, 2012 and an increase of $11.8 million from March 31, 2012.

- ***On October 26, 2012, Abiomed was informed that the United States Attorney's Office for the District of Columbia is conducting an investigation that is focused on the Company's marketing and labeling of the Impella 2.5. On October, 31, 2012, Abiomed accepted service of a Health Insurance Portability and Accountability Act administrative subpoena related to this investigation. The subpoena seeks documents related to the Impella 2.5 and we understand the investigation focuses primarily on marketing and labeling issues. Abiomed is in the process of responding to the subpoena and intends to cooperate fully.***

- In September 2012, the PROTECT II study was published in Circulation, the journal of the American Heart Association. The article, titled "A Prospective Randomized Clinical Trial of Hemodynamic Support with Impella 2.5 versus Intra-Aortic Balloon Pump in Patients Undergoing High-Risk Percutaneous Coronary Intervention: the PROTECT II Study," was published online on August 30, 2012 and in print on October 2, 2012.

- In September, the American Medical Association confirmed three new Category I Current Procedural Terminology (CPT®) codes for Impella percutaneous technologies, effective January 1, 2013. In November 2012, SCAI, ACC, and HRS will provide more details on the valuation and payment of the specific codes.

- Abiomed received 510(k) clearance in September from the U.S. Food and Drug Administration for Impella CP™, a new percutaneous catheter-based Impella device.  The increased flow is delivered on the same console platform, 9 French catheter, and introducer as the Impella 2.5. The Impella CP is available under a controlled launch with top U.S. heart hospitals.

- Abiomed believes that the Food and Drug Administration (FDA) 515 Program Initiative will hold an Advisory Panel in early December 2012 to review the classification determination of "intra-aortic balloon and control systems," and "nonroller-type cardiopulmonary bypass blood pumps," which includes Impella products. Since this has not been formally announced by the FDA, this estimated timing is subject to change.

- At the Transcatheter Cardiovascular Therapeutics 2012 meeting in October, a clinical update on the Symphony program was presented. The second successful Symphony implant patient received 28 days of continuous therapy at the McGill University Health Centre (MUHC) in Montreal, Canada. Symphony also received Agence Nationale de Sécurité due Médicament (ANSM) approval in France, enabling its use in clinical

trials. The Symphony is not cleared for sale or use in the United States and is currently being used in clinical investigations in Canada and France.

(Emphasis added).

43.     On this news, shares of Abiomed declined $6.31 per share, 31.33%, to close on November 1, 2012, at $13.61, on heavy trading volume.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

44.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

45.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

46.     Plaintiff is the owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

47.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants Minogue, Austen, Lataif, Puhy, Sutter, Termeer and Thomas.

48.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants

because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.      Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.      Defendants Minogue, Sutter and Thomas lack both the independence and disinterestedness required to impartially consider a demand by Plaintiff because they are directly tied to each other having served on other Boards together.  Therefore, neither Minogue, Sutter or Thomas would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves;

c.      Defendant Minogue serves as the CEO, President, and Chairman of the Company and derives his principal income from his employment at the Company.  Defendant Minogue received $4,193,467 in total salary and incentive compensation from the Company in 2012.   The Company, moreover, has admitted in its proxy statements that Minogue is not an independent director under the applicable rules of the Nasdaq Stock Market.  Accordingly, reasonable doubt exists that defendant Minogue can be disinterested and independent in evaluating plaintiff's demand.

d.      Defendant Thomas served as a consultant for the Company from January 29, 2010 until he was elected as a Class I Director on May 26, 2011. As a consultant, defendant Thomas was granted an option to purchase 15,000 shares of the Company's common stock on

January 29, 2010, which vested over three years.  Because of this financial interest, defendant Thomas is not disinterested and cannot fairly assess a demand.

e.        Abiomed's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.  These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.  Noted below are the terms of the substantial compensation that these directors have received, which demonstrate that demand upon such individuals would be futile:

**Compensation of Non-Employee Directors
for Fiscal 2012**

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Option Awards ($)(2) | Total ($) |
|---|---|---|---|---|
| W. Gerald Austen (3) | $  41,000 | $    — | $    — | $  41,000 |
| Louis E. Lataif | 43,500 | 54,930 | — | 98,430 |
| Desmond H. O'Connell, Jr. (4) | 18,215 | — | — | 18,215 |
| Dorothy E. Puhy | 83,500 | 54,930 | — | 138,430 |
| Eric A. Rose (5) | 41,000 | 54,930 | — | 95,930 |
| Martin P. Sutter (6) | 51,000 | 54,930 | — | 105,930 |
| Henri A. Termeer (7) | 45,788 | 54,930 | — | 100,718 |
| Paul Thomas | 35,044 | 54,930 | 89,752 | 179,726 |

Directors of ABIOMED who are not our employees receive an annual retainer of $36,000 or an equivalent value of our common stock, at the individual's option. Our Lead Director receives additional annual compensation of $25,000. In addition, the Chair of our Audit Committee receives additional annual compensation of $17,500 and each member of our Audit Committee receives additional annual compensation of $7,500. The Chair of our Compensation Committee receives additional annual compensation of $10,000 and each member of our Compensation Committee receives additional annual compensation of $5,000. The Chair of our Nominating and Governance Committee receives additional annual compensation of $7,000 and each member of our Nominating and Governance Committee receives additional annual compensation of $5,000. If our Board of Directors or any of its Committees has an unusually large number of meetings in any year, our Board of Directors has the authority to pay each Director $1,200 for attendance at meetings of our Board of Directors and $1,000 for attendance at any meetings of

Committees of our Board of Directors. Similarly, our Board of Directors has the authority to pay $1,000 to the Chair of our Audit Committee for attendance at meetings of our Audit Committee and $1,300 to the Chair of our Nominating and Governance Committee for attendance at meetings of our Nominating and Governance Committee.

Our non-employee directors are also eligible to receive stock options and other awards under our stock incentive plans. It is currently our policy to grant each non-employee director who continues to be a director following our annual meeting of stockholders, a performance share award in the form of restricted stock units covering 5,333 shares of our common stock, vesting annually over three years from the date of grant. It is also currently our policy to grant a stock option to purchase 25,000 shares of our common stock upon the appointment of new non-employee directors, with an exercise price of the fair market value of our common stock on the date of grant, and vesting annually over five years.

Our directors are also eligible for additional compensation in the event that they perform additional services for ABIOMED in excess of the normal time commitments we expect of our directors.

f.       Defendants lack both the independence and disinterestedness required to impartially consider a demand by Plaintiff because they all hold substantial financial interest in Abiomed and therefore would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves, as the chart below illustrates:

| Name(1) | Outstanding | Right to acquire(2) | Total | Percentage |
|---|---|---|---|---|
| Martin P. Sutter (6) | 3,226,880 | 57,778 | 3,284,658 | 8.30% |
| Michael R. Minogue | 72,241 | 637,266 | 709,507 | 1.77% |
| Henri A. Termeer | 61,732 | 84,778 | 146,510 | * |
| W. Gerald Austen | 82,200 | 44,000 | 126,200 | * |
| Dorothy E. Puhy | 28,654 | 81,278 | 109,932 | * |
| Louis E. Lataif | 8,029 | 78,778 | 86,807 | * |
| Paul Thomas | — | 11,778 | 11,778 | * |
| All executive officers and directors as a group (12 persons) | 3,625,539 | 1,791,322 | 5,416,861 | 13.12% |

g.       The entire Board and senior management participated in the wrongs complained of herein.   For the reasons described herein, the Company's directors are not disinterested or independent.   Pursuant to their specific duties as Board members, each was

charged with the management of the Company and the conduct of its business affairs.  Each of

the above referenced defendants breached the fiduciary duties they owed to the Company and its

shareholders in that they failed to prevent and correct the dissemination of the Company's false

and misleading statements.  Thus, the Board cannot exercise independent objective judgment in

deciding whether to bring this action or whether to vigorously prosecute this action because its

members are interested personally in the outcome since their actions have subjected the

Company to millions of dollars in potential liability for violations of applicable securities laws;

        h.     Defendant Minogue certified many of the Company's SEC filings.

Accordingly, demand is futile because of the substantial likelihood of liability for breach of

fiduciary duties owed to the Company through the certification of the Company's SEC filings;

        i.     Each of the key officers and directors knew of and/or directly benefited

from the wrongdoing complained of herein thereby rendering demand futile;

        j.     The Individual Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of

herein, and are therefore not disinterested parties;

        k.     In order to bring this suit, all of the Company's directors would be forced

to sue themselves and persons with whom they have extensive business and personal

entanglements, which they will not do, thereby excusing demand;

        l.     The acts complained of constitute violations of the fiduciary duties owed

by the Company's officers and directors and these acts are incapable of ratification;

        m.     Each of the Individual Defendants authorized and/or permitted the false

statements disseminated directly to the public and which were made available and distributed to

shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

n.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

o.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby; and

p.      If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.   Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

49.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

50.     Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons:

a.      The Company is a publicly held, with over 39 million shares outstanding and thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and

c.      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

51.     Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class actions entitled *Simon v. Abiomed, Inc.*, et al., Case No. 12-cv-12137-FDS, currently pending in the United States District Court for the District of Massachusetts.  Through their intentional misconduct, the Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action.  Such actions by the Individual Defendants cannot be protected by the business judgment rule.  Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**
**FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)**

52.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

53.     The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws.   The Individual Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate filings that were materially misleading and failing to disclose material information.

54.     As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.   Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.   The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

55.     Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.   As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## <u>(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN ADEQUATE INTERNAL CONTROLS)</u>

56.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

57.     As alleged herein, the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  When placed on notice of problems with the Company's business practices and operations – and actual or potential violations of GAAP – the Individual Defendants had an obligation to act in good faith to take appropriate action to correct the misconduct alleged and to prevent its recurrence.

58.     The Individual Defendants willfully ignored the obvious and pervasive problems with the Company's internal controls and actual or potential violations of GAAP alleged herein. Moreover, the Individual Defendants failed to make a good faith effort to correct these problems or to prevent their recurrence.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## <u>(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)</u>

59.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

60.     The Individual Defendants owed the Company fiduciary obligations.  By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

61.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations.  As a direct and proximate result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the Company has sustained significant damages monetarily and injury to its corporate image and goodwill.

62.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff, moreover, has no adequate remedy at law.

**COUNT IV**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)**

63.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

64.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

65.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the

Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

66. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

67. The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

68. The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT VI
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

69. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

70. The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

71.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VII
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

72.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

73.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

74.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

i.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

ii.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

iii.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  February 4, 2013                    **PASTOR LAW OFFICE LLP**

                                            /s/ David Pastor
                                            David Pastor (BBO# 391000)
                                            63 Atlantic Avenue, 3rd Floor
                                            Boston, MA 02110
                                            Telephone: (617) 742-9700
                                            Facsimile:  (617) 742-9701
                                            dpastor@pastorlawoffice.com

                                            **THE BRISCOE LAW FIRM, PLLC**
                                            Willie C. Briscoe
                                            Campbell Centre II
                                            8150 N. Central Expressway, Ste. 1575
                                            Dallas, Texas 75206
                                            Telephone:  (214) 239-4568
                                            Facsimile:  (281) 254-7789

                                            **POWERS TAYLOR LLP**
                                            Patrick Powers
                                            Zach Groover
                                            Campbell Centre II
                                            8150 N. Central Expressway, Ste. 1575
                                            Dallas, Texas 75206
                                            Telephone:  (214) 239-8900
                                            Facsimile: (214) 239-8901

                                            **GLANCY, BINKOW, & GOLDBERG, LLP**
                                            Michael M. Goldberg
                                            Ex Kano S. Sams II
                                            1925 Century Park East
                                            Suite 2100
                                            Los Angeles, California 90067
                                            Telephone:  (310) 201-9150
                                            Facsimile:   (310) 201-9160

                                            *Attorneys for Plaintiff Marta Bryceland*